JUDGE SULLIVAN

  

Kennedy, Jennik & Murray, P.C.
Attorneys for Plaintiffs
113 University Place - 7th Floor
New York, New York 10003
(212) 358-1500
John R. Howard (JH1034)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x

DISTRICT COUNCIL 1707,
AMERICAN FEDERATION OF STATE,
COUNTY AND MUNICIPAL EMPLOYEES,
AFL-CIO, and LOCAL 389, DISTRICT
COUNCIL 1707, AMERICAN FEDERATION
OF STATE, COUNTY AND MUNICIPAL
EMPLOYEES, AFL-CIO,



     Plaintiffs,

   -against-


METROCARE HOME SERVICES

     Defendant.
-------------------------------------------------------x



  Plaintiffs, by their attorneys, Kennedy, Jennik & Murray, P.C., allege as follows:


## NATURE OF ACTION

  1.  This is an action arising under § 301 of the Labor Management Relations Act, 29

U.S.C. § 185, and § 9 of the Federal Arbitration Act, 9 U.S.C. § 9, to confirm an arbitration

award issued to remedy the breaches by defendant of a collective bargaining agreement.

## JURISDICTION

2.      This court has subject matter jurisdiction pursuant to 29 U.S.C. §185 and 28 U.S.C. § 1331.

## PARTIES

3.      Plaintiffs District Council 1707, American Federation of State, County and Municipal Employees, AFL-CIO, and Local 389, District Council 1707, American Federation of State, County and Municipal Employees, AFL-CIO (referred to herein collectively as "DC 1707" or the "Union"), are labor organizations as defined by § 2(5) of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 152(5), and maintain their principal place of business at 75 Varick Street, New York, New York 10013, in the County of New York, State of New York.

4.      Defendant MetroCare Home Service, Inc. ("MetroCare" or the "Employer") is an employer as defined by § 2(2) of the NLRA, 29 U.S.C. § 152(2), and maintains its principal place of business at 21 East 26th Street, New York, New York. Defendant is a company providing home care services.

## FACTS

5.      At all times relevant to this action, the relationship of the Employer and Union was governed by a collective bargaining agreement (the "CBA"), which provides, inter alia, that (1) MetroCare employees are not to be terminated or otherwise disciplined without just cause and (2) disputes concerning employee discipline are to be submitted to binding arbitration. A copy of the CBA is annexed hereto as Exhibit 1.

2

6.    On December 5, 2006, MetroCare terminated one of its employees, Kwaku Anane, ("Anane"), from his position as home care attendant, which is a title whose terms and conditions of employment are governed by the CBA.

7.    Pursuant to the grievance procedures contained in the CBA, the Union filed a grievance alleging that MetroCare had breached the CBA by terminating Anane without just cause.

8.    Attempts to settle the Union's grievance were unsuccessful.

9.    In accordance with the terms of the CBA, the Union duly demanded arbitration of the dispute concerning Anane's termination.

10.    On July 30, 2007, arbitration hearings were held in New York, New York, under the auspices of the American Arbitration Association ("AAA").  Arbitrator Jay Nadelbach, Esq. (the "Arbitrator") issued an opinion and award in the case on August 16, 2007.  A copy of the Arbitrator's opinion and award (the "Award") is annexed hereto as Exhibit 2.

11.    The Arbitrator found that the Employer failed to establish that Anane was guilty of misconduct justifying his termination and directed that he be reinstated to his position with full back pay and benefits.  The Arbitrator also directed the Employer to pay half of the Arbitrator's fees and expenses, and half of the fees charged by the AAA, for their services rendered in connection with the Anane arbitration.

12.    The Employer has not complied with the Arbitrator's Award with respect to back pay.

## CAUSE OF ACTION

13.     Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 12 as if fully set forth herein.

14.     Defendant has failed to comply with the Arbitrator's Award by refusing and failing to pay Anane the back pay the Arbitrator awarded him.

15.     Plaintiffs are therefore entitled to a judgment confirming the Arbitrator's Award and directing Defendant to pay Anane full back pay and benefits.

WHEREFORE, plaintiffs demand judgment:

1.     Confirming the arbitration award of Arbitrator Jay Nadelbach, dated August 16, 2007;

2.     Directing that judgment be entered thereon in this Court;

3.     Awarding prejudgment interest at the rate of 9% for all monetary relief;

4.     Awarding plaintiffs' attorney's fees and costs; and

5.     Such other and further relief as the Court deems just and proper.

Dated: New York, New York
          August 9, 2008

KENNEDY, JENNIK & MURRAY, P.C.
Attorneys for Plaintiffs

By:
          John R. Howard (JH1034)
113 University Place, 7th Floor
New York, New York 10003
(212) 358-1500

# EXHIBIT

# A

# AGREEMENT

between

# MetroCare Home Services, Inc.

-and-

# District Council 1707
# CSAEU, AFSCME
# AFL-CIO

Date: January 1, 2003 through December 31, 2004

# TABLE OF CONTENTS

Page No.

ARTICLE I - RECOGNITION - THE COLLECTIVE BARGAINING UNIT ...................1
ARTICLE II - UNION SECURITY AND CHECKOFF............................................1
ARTICLE III - MANAGEMENT RIGHTS ....................................................3
ARTICLE IV - DISCHARGE, DISCIPLINE OR SUSPENSION.................................5
ARTICLE V - UNION VISITATION AND BULLETIN BOARDS .............................6
ARTICLE VI - SENIORITY .................................................................7
ARTICLE VII - FAMILY AND MEDICAL LEAVE POLICY ...............................10
ARTICLE VIII - NEW EMPLOYEES ........................................................15
ARTICLE IX - GRIEVANCE PROCEDURE ................................................16
ARTICLE X - ARBITRATION PROCEDURE.................................................18
ARTICLE XI - NO-STRIKE/NO-LOCKOUT CLAUSE .....................................20
ARTICLE XII - HOLIDAYS ..................................................................21
ARTICLE XIII VACATIONS...................................................................24
ARTICLE XIV- SICK LEAVE ...............................................................24
ARTICLE XV - WAGES .......................................................................25
ARTICLE XVI – PAYROLL.................................................................. 26
ARTICLE XVII - NO ENTRY COMPENSATION ........................................26
ARTICLE XVIII MILITARY LEAVE .......................................................27
ARTICLE XIX- JURY DUTY .................................................................27
ARTICLE XX - BEREAVEMENT............................................................27
ARTICLE XXI - SCOPE OF BARGAINING ..............................................28
ARTICLE XXII - SEPARABILITY ...........................................................29
ARTICLE XXIII HOME CARE RIGHTS ...................................................29
ARTICLE XXIV- NO DISCRIMINATION ..................................................29
ARTICLE XXV - CARFARE .................................................................29
ARTICLE XXVI - HEALTH BENEFITS.................................................... 30
ARTICLE XXVII - PENSION BENEFITS ..................................................30
ARTICLE XXVIII DURATION ...............................................................30

## AGREEMENT

THIS AGREEMENT made and entered into this ___ day of _____, 2003

between MetroCare Home Services, Inc. (hereinafter referred to as "Employer" or "Company")

whose principle office is located at 21 East 26th Street, New York, New York, and District

Council 1707 CSAEU, AFSCME, AFL-CIO (hereinafter referred to as the "Union") with its

office at 75 Varick Street, New York, New York.

### ARTICLE I
### RECOGNITION – THE COLLECTIVE BARGAINING UNIT

1.      The Employer recognizes the Union as the sole and exclusive bargaining

representative for all full-time and regular part-time home care workers, home

attendants, home health aids, certified personal care aides and home makers,

excluding all other employees including all clerical employees, professional

employees, managerial employees, confidential employees, and guards and

supervisors as defined in the National Labor Relations Act.

2.      The words "employee" or "employees" as used in this Agreement shall refer only to

individuals employed by the Employer in the classifications set forth in Paragraph 1,

above.

3.      Regular Full-time employees are employees regularly scheduled to work 40 hours or

more.  Regular Part-time employees are employees regularly scheduled to work less

than 40 hours.

### ARTICLE II
### UNION SECURITY AND CHECKOFF

1.      Membership in the Union shall be required of all Employees in the bargaining unit as a

condition of employment no later than the completion of:

(1)    thirty (30) consecutive days of actual work, or

(2)    three hundred sixty (360) hours of actual work within a ninety-day period following the beginning of employment or re-employment, whichever comes sooner.

Upon the Union's request in writing and upon twenty (20) days written notice to the employee, the Employer shall discharge any employee who has failed to pay Union dues as required by this Article II.

2.    For the purpose of this Article, an employee shall be considered a member of the Union in good standing if the employee tenders a sum equivalent of the periodic dues uniformly required of membership.

3.    The Union agrees that it will indemnify and hold the Employer harmless from any recovery of damages sustained by reason of any action taken under this Article.

4.    The Employer shall make monthly deductions from the wages of employees from whom it has received a written authorization, and remit same to the Union, for the payment of Union membership dues, and where applicable Union initiation fees, provided said authorizations shall be irrevocable for a period of one year or the duration of this Agreement, whichever is earlier.

5.    The Employer shall have no responsibility to insure the Employees sign and file a proper and current check-off authorization.

6.    Membership dues shall be paid according to the following schedule:

| Hours Of Work Per Pay Period | Amount Of Dues To Be Paid |
| --- | --- |
| 32 hours or less | None |

|                                      |               |
|--------------------------------------|---------------|
| More than 32 hours up to 40 hours    | One-Half Dues |
| More than 40 hours                   | Full Dues     |

7. Upon receipt from an employee of a written authorization for the District Council 1707 CSAEU Federal Credit Union, the Employer shall deduct from the wages due that employee once a month the sum specified in the authorization(s) and remit same to the District Council 1707 CSAEU Federal Credit Union. The Employer reserves the right to discontinue the check-off for the District Council 1707 CSAEU Federal Credit Union for any employee who makes two or more requests for changes, of whatever nature, in that deduction during a calendar year.

8. It is specifically agreed that the Employer assumes no obligation, financial or otherwise, arising out of the provisions of this Article, and the Union hereby agrees that it will indemnify and hold the Employer harmless from any claims, actions or proceedings by any employee arising from deductions made by the Employer hereunder. Once the funds are remitted to the Union, their disposition thereafter shall be the sole and exclusive obligation and responsibility of the Union.

## ARTICLE III
## MANAGEMENT RIGHTS

1. The Company retains the exclusive right to manage the business, to direct, control and schedule its operations and work force and to make any and all decisions affecting the business, whether or not specifically mentioned herein and whether or not heretofore exercised except as specifically limited by the express terms of this Agreement. Such prerogatives shall include, but not be limited to, the sole and exclusive rights to plan, direct and control operations to determine the number and classifications of employees; to assign

work and to determine which and the number of employees to send to a client; determine job qualifications, work shifts, work pace, work performance levels, standards of performance, and methods of evaluation of the employees; schedule hours and days of work and the work week; hire, promote or transfer employees; to discipline or discharge for cause; to lay off employees; to require employees to observe the Employer's rules and regulations; and to transfer, relocate, sell, subcontract, curtail, suspend, abandon, cease, or expand any or all operations or functions; and to determine whether, and the methods and means by which operations are to be carried on, expended, reduced or terminated in whole or in part. The Employer shall be free to continue to operate and conduct business in all respects as presently operated. Subcontracting shall not be for the purpose or intention of eliminating bargaining unit positions.

2. The provisions of this Agreement do not prohibit the Company from directing any person not covered by this Agreement from performing any task. The Company, therefore, has the right to schedule its management and supervisory personnel at any time. The selection of supervisory personnel shall be the sole responsibility of the Company and shall not be subject to the grievance and arbitration provisions of this Agreement.

3. The foregoing statement of the rights of management and of Company functions are not all-inclusive, but indicate the type of matters or rights which belong to and are inherent in management and shall not be construed in any way to exclude other Company functions not specifically enumerated. All the rights, including the right to change terms and conditions of employment, powers, discretion, authority and prerogatives possessed by the Employer prior to the execution of this Agreement, whether exercised or not, are retained by and are to remain exclusively with the Employer and may be exercised without prior notice to and

consultation with the Union, except those specifically abridged or modified by the express terms of this Agreement and any supplementary Agreement that may hereinafter be made.

## ARTICLE IV
## DISCHARGE, DISCIPLINE OR SUSPENSION

1. The Employer shall have the right to maintain discipline and efficiency of its operations, including the right to discharge, suspend, or discipline any employee for just cause. Just cause shall include, but not be limited to, the following:

   A.    Forging a client's signature on time sheets.

   B.    Physically abusing a client.

   C.    Leaving a client unattended due to an unreported absence to MetroCare.

   D.    Theft from agency or client.

   E.    Abusing the use of a client's telephone.

   F.    Consuming or being under the influence of alcohol or non-prescription drugs during working hours or on company property.

   G.    Failure to notify MetroCare of an absence and/or arranging for a person to take over care of a client without MetroCare's permission.

   H.    Having friends or relatives accompany the Employee to the employee's client without MetroCare's permission.

   I.    Failing to attend medical exams or in-service training, provided the employee is given reasonable opportunity to attend.

2. Any temporary, or introductory employee may be discharged or disciplined by the Employer in its sole discretion. No question concerning the discipline or discharge of any such employee shall be the subject of arbitration.

5

3.    The Employer may establish reasonable performance standards. Any employee failing to meet these standards will be subject to discipline under the appropriate terms of the Agreement.

## ARTICLE V
## UNION VISITATION AND BULLETIN BOARDS

1.    The business representatives of the Union, or duly authorized representatives of the Union, may enter the Employer's premises at reasonable times during working hours to confer with the Employer and/or a unit Employee for the purpose of administering the Agreement or other official Union business, provided, however, such representative shall first telephone or write to the Employer or his designee to make mutually convenient arrangements for the visit. The Union representatives shall advise the designee of their visit, the purposes therefor, and the individuals with whom they may wish to confer.

2.    Upon arrival at the facility, the Union representatives shall report to the Employer or his designee. The Union representatives shall advise the Employer of their visit, the purpose therefor, and the individuals with whom they may wish to confer.

3.    The Union and its representatives shall not contact, visit or attempt to contact any employee in the bargaining unit at the client's home for any purpose.

4.    No union meetings shall be held on the Employer's premises at any time unless authorized by management.

5.    The Employer shall provide a bulletin board which shall be used for the purpose of posting proper Union notices. The Union shall not post any defamatory or slanderous notices.

6.    Employees shall not engage in solicitation when either the employee soliciting or the

employee solicited is on working time or in immediate care areas at any time. Employees shall not engage in distribution of literature during working time or in working areas. Employees shall not solicit clients at any time or for any purpose.

## ARTICLE VI
## SENIORITY

1.    Seniority:

Seniority shall be defined as the employee's length of continuous service with the Employer in the bargaining unit commencing with the date and hour on which the employee began to work after last being hired. Bargaining unit seniority shall apply in computation and determination of eligibility for all benefits where length of service is a factor pursuant to the Agreement, and layoffs as herein provided.

2.    Accrual of Seniority:

A.    Seniority shall not accrue to introductory employees during the introductory period. However, at the successful completion of the introductory period, the employee's seniority shall be considered to commence from the date first worked after hire, and shall accrue during his/her continuous employment with the Company within the bargaining unit covered by this Agreement.

B.    An employee shall not accrue seniority while on layoff or on an unpaid leave of absence.

3.    Loss of Seniority:

A.    An employee shall lose accumulated seniority and seniority shall be broken for any of the following reasons:

1.    Resignation.

2.    Discharge for just cause.

3.    Failure to report to work after a lay-off, within four (4) days after receipt of written notice of recall sent by the Employer to the Employee at his/her last address of record on file with the Employer.

4.    Layoff which either extends:

    (a)    in excess of six (6) consecutive months, or

    (b)    for the period of the employee's length of service, which ever is less.

5.    Absence for a period of three (3) consecutive working days without notifying the Employer.

6.    Unauthorized failure to report to work at the expiration of a leave of absence pursuant to this Agreement.

7.    Taking employment elsewhere during the period of a contractual leave of absence without the express consent of the employer.

8.    Any break in employment for any reason for a period of six (6) months.

B.    An employee whose seniority is lost for any of the reasons outlined in Paragraph 3A above shall be considered as a new employee if she/he is again employed by the Employer. The failure of the Employer to rehire said employee after the loss of seniority shall not be subject to the grievance and arbitration provisions of this Agreement.

4.    <u>Layoffs</u>:

A.    The necessity for layoffs or reduction of staff shall be in the sole discretion of the Employer.  The determination of the number of employees to be laid off, from

which areas are to be laid off and the methods of layoff shall be in the sole discretion of the Employer.

B.  In the event the Employer finds it necessary and desires to reduce its staff by laying off employees, it shall notify the Union as to its intention and shall inform the Union of the names of the employees who have been or who are to be laid off, as well as the effective date of the layoff.

C.  Whenever a vacancy occurs, employees who are on layoff shall be recalled. Recalled first shall be the last person laid off provided that person is capable of performing the work involved. Recall shall thereafter continue, as above, in reverse order of layoff.

5.  <u>Miscellaneous</u>

A.  The Company may utilize a temporary employee for the duration of an employee's contractual leave of absence or for the duration of an employees absence as a result of sickness, accident, or injury on the job or any other absence. However, should the temporary employee become a permanent employee, they shall become part of the bargaining unit covered by the collective bargaining agreement effective upon the date of permanent employment. The Employer shall consider hiring laid off or unemployed full time employees to fill temporary positions. The Employer shall not be required to hire said employees by seniority and may pick and choose which employee to hire.

B.  Promotions of whatever kind and nature shall be the sole prerogative of the Employer and shall not be subject to the grievance and arbitration provisions of this Agreement.

C.   In the event an employee is offered another job by the Employer outside the bargaining unit and the employee accepts such job and leaves the bargaining unit, such employee shall lose all his/her seniority rights under this Agreement unless that employee returns to the bargaining unit within thirty (30) days.   In that event the employee shall rejoin the unit with the same amount of seniority as when they left.

D.   It shall be the responsibility of the employee to keep the Employer informed of his/her present address and telephone number and to notify the Employer, in writing of any such changes within five (5) days of the date of any change.  The Employer shall provide the Union with any changes in employee addresses and telephone numbers, in writing, on a quarterly basis.

E.   Regular part-time employees shall accrue seniority on a pro-rata basis.

## ARTICLE VII
## FAMILY AND MEDICAL LEAVE POLICY

1.   The Leave Policy.   An Employee is eligible to take up to 12 weeks of unpaid family/medical leave within any rolling 12 month period and be restored to the same or an equivalent position upon his/her return from leave provided he or she has worked for the Company for at least 12 months, and for at least 1250 hours in the last 12 months.

2.   Reasons For Leave.   An employee may take family/medical leave for any of the following reasons:  (1) the birth of a son or daughter and in order to care for such son or daughter; (2) the placement of a son or daughter with the employee for adoption or foster care; (3) to care for a spouse, son, daughter, or parent ("covered relation") with a serious health condition; (4) because of the employee's own serious health condition which

renders him/her unable to perform the functions of his/her position (includes disability or worker's compensation). Leaves because of reasons "1" or "2" must be completed within the 12-month period beginning on the date of birth or placement.

3.  Notice Of Leave.  If an employee's need for family/medical leave is foreseeable, he/she must give the Company at least 30 days prior written notice. If this is not possible, he/she must at least give notice within 1 to 2 business days of learning of his/her need for leave. Failure to provide such notice may be grounds for delay of leave. Where the need for leave is not foreseeable in advance, the employee is expected to notify the Company within 1 to 2 business days of learning of his/her need for leave, except in extraordinary circumstances. The Company has Request for Family/Medical Leave forms available from the Human Resources Department. An employee should use these forms when requesting leave.

4.  Medical Certification.  If an employee requests leave because of his/her own or a covered relation's serious health condition, he/she and the relevant health care provider must supply appropriate medical certification. An employee may obtain Medical Certification Forms from the Human Resources Department. When an employee requests leave, the Company will notify him/her of the requirement for medical certification and when it is due. Failure to provide requested medical certification in a timely manner may result in denial of leave until it is provided. The Company, at its expense, may require an examination by a second health care provider designated by the Company, if it reasonably doubts the medical certification the employee initially provides. If the second health care provider's opinion conflict with the original medical certification, the Company, at its expense, may require a third, mutually agreeable, health care provider to

11

conduct an examination and provide a final and binding opinion. The Company may require subsequent medical recertification on a reasonable basis.

5.   <u>Reporting While On Leave</u>.  If an employee takes leave because of his/her own serious health condition or to care for a covered relation, the employee must contact the Company on the first and third Tuesday of each month regarding the status of the condition and his/her intention to return to work.

6.   <u>Leave Is Unpaid</u>.  Family/medical leave is unpaid leave.  Employees will be required to use all accumulated sick leave during a family/medical leave.  If an employee requests leave because of a birth, adoption or foster care placement of a child, any accrued paid vacation first will be substituted for unpaid family/medical leave.  If an employee requests leave because of his/her own serious health condition, any accrued paid sick time first will be substituted for unpaid family/medical leave and thereafter any other accrued paid vacation will be substituted for unpaid family/medical leave.  If an employee requests leave to care for a covered relation with a serious health condition, any accrued paid vacation first will be substituted for any unpaid family/medical leave. The substitution of paid leave time for unpaid leave time does not extend the 12-week leave period.

7.   <u>Medical And Other Benefits</u>.  During an approved family/medical leave, the Company will maintain health benefits, as if the employee continued to be actively employed.  If paid sick time or paid leave is substituted for unpaid family/medical leave, the Company will deduct the employee's portion of the health plan premium as a regular payroll deduction.  If leave is unpaid, the employee must pay his/her portion of the premium by mailing a check on the first of each month payable to the Company to the Company's

Human Resources Department. The employee's health care coverage will cease if his/her premium payment is more than 30 days late. If the employee elects not to return to work at the end of the leave period, he/she will be required to reimburse the Company for the cost of the premiums paid by the Company for maintaining coverage during his/her leave, unless he/she cannot return to work because of a serious health condition or other circumstances beyond his/her control.

8.   Intermittent And Reduced Schedule Leave.  Leave because of a serious health condition, may be taken intermittently (in separate blocks of time due to a single health condition) or on a reduced leave schedule (reducing the usual number of hours the employee works per workweek or workday) if medically necessary. If leave is unpaid, the Company will reduce the employee's salary based on the amount of time actually worked. In addition, while an employee is on an intermittent or reduced schedule leave, the Company may temporarily transfer him/her to an available alternative position which better accommodates his/her recurring leave and which has equivalent pay and benefits.

9.   Returning From Leave.  If an employee takes leave because of his/her own serious health condition, he/she is required to provide medical certification that he/she is fit to resume work. The employee may obtain Return to Work Medical Certification Forms from the Human Resources Department. Employees failing to provide the Return to Work Medical Certification Form will not be permitted to resume work until it is provided.

10.  Definitions.  For the purposes of the Family and Medical Leave policy, the following definitions apply:

a.    "Spouse" is defined in accordance with applicable State law.

b.    "Parent" includes biological parents and individuals who acted as the employee's

13

parents, but does not include parents in-law.

    c.    "Son" or "daughter" includes biological, adopted, foster children, stepchildren, legal wards, and other persons for whom the employee acts in the capacity of a parent and who is under 18 years of age or over 18 year of age but incapable of caring for themselves.

    d.    "Serious Health Conditions" means an illness, injury, impairment, or physical or mental condition which involves:

    (1)    any capacity or treatment in connection with inpatient care;

    (2)    an incapacity requiring absence of more than three calendar days and continuing treatment by a health care provider; or

    (3)    continuing treatment by a health care provider of a chronic or long-term condition that is incurable or will likely result in incapacity of more than three days of not treated.

    e.    "Continuing treatment" means:

    (1)    two or more treatments by a health care provider;

    (2)    two or more treatments by a provider of health care services (e.g., physical therapist) on referral by or under orders of a health care provider;

    (3)    at least one treatment by a health care provider which results in a regimen of continuing treatment under the supervision of the health care provider (e.g., a program of medication or therapy); or

    (4)    under the supervision of, although not actively treated by, a health care provider for a serious long-term or chronic condition or disability which can not be cured (e.g., Alzheimer's or severe stroke).

f.    "Health care provider" includes:  licensed MDs and ODs, podiatrists, dentists, clinical psychologists, optometrists, chiropractors authorized to practice in the State, nurse practitioners and nurse-midwives authorized under State Law, and Christian Science practitioners.

g.    "Needed to care for" a family member encompasses:

   (1)    physical and psychological care: and

   (2)    where the employee is needed to fill in for others providing care or to arrange for third party care of the family member.

h.    The phrase "unable to perform the functions of his/her job" means an employee is:

   (1)    unable to work at all; or

   (2)    unable to perform any one of the essential functions of his/her position.

i.    The term "essential functions" is borrowed from the Americans with Disabilities Act ("ADA") to mean "the fundamental job duties of the employment position," but does not include the marginal functions of the position.

### ARTICLE VIII
### NEW EMPLOYEES

1.    All newly-hired employees of the Employer who are hired on or after the effective date of this Agreement, whether or not previously employed by the Employer, shall be deemed introductory employees and shall be subject to an introductory period of 360 hours or six (6) months, whichever is longer, commencing with the day first worked after hire.

2.    The Employer may extend the introductory period for an additional one month.

3.    A.    A new 90 day introductory period shall be required for any employee who has

15

previously passed the introductory period and who has not worked for the Employer during any consecutive 150 day period.

B.    Any employee who had not previously passed the introductory period and leaves the Employer's employ will be required to complete a new introductory period. Such employee shall be given credit for previous introductory time served, up to 30 days, if the employee's work performance was acceptable prior to layoff and the employee returns to work within 90 days after the last date employed.

4.    Seniority shall not accrue to introductory employees during the introductory period. However, at the successful completion of the introductory period, the employee's seniority shall be considered to commence from the date first worked after hire.

5.    Notwithstanding any other provision of this Agreement, the Employer may, at any time prior to the end of the introductory period, lay off, discipline or discharge such introductory employee, with or without cause, and no claim may be made by the Union or any of the employees that the layoff, discipline, or discharge was improper. Moreover, the Employer's action with respect to such introductory employee shall not be made the subject matter of the grievance or arbitration procedure by the employee or Union.

## ARTICLE IX
## GRIEVANCE PROCEDURE

1.    Any grievance or dispute arising out of the application or meaning of the terms of this Agreement during the term of this Agreement and not specifically excluded from the grievance and arbitration procedure by this or any other provision of this Agreement shall be taken up in the manner set forth below.

2.    Failure to properly present a grievance at any stage of the grievance procedure shall

constitute a waiver of such grievance and bar all further action thereon.

3.　It is mutually understood and agreed that nothing herein will prevent an employee from discussing any problem with his supervisor or other representative of management at any time, prior to initiating a formal grievance.

Step 1　When an issue arises, the employee shall notify the supervising coordinator within seven (7) business days from the date of occurrence or the date the aggrieved employee, by use of reasonable diligence, could have known of the occurrence of the act upon which such grievance is based. If the supervising coordinator denies the grievance or fails to respond within seven (7) calendar days after receiving notice of the grievance, then the Union has the right, within ten (10) calendar days of the response or, if not responded to, within ten (10) calendar days after the date the response was due, to proceed to Step 2 and submit the grievance in writing to the Director of Field Operations.

Step 2　If the issue is not resolved in Step 1, the Union may submit a written grievance to the Director of Field Operations, with a copy to the employee, within ten (10) calendar days after the employee receives a response in Step 1 or, if no response is received, within ten (10) calendar days after the date the response was due. Such writing shall specify in detail the acts upon which the grievance is based. If the Director of Field Operations denies the grievance in writing or fails to respond within ten (10) calendar days after receiving written notice of the grievance, then the Union has the right, within ten (10) calendar days of the response or, if not responded to, within ten (10) calendar days after the date the response was due, to proceed to Step 3 and submit the grievance in writing to the Vice President.

17

Step 3  If the issue is not resolved in Step 2, the Union, within ten (10) calendar days of the Director of Field Operation's response or, if no response is received, within (10) calendar days after the date the response was due, may request a meeting with the Vice President or his designee to discuss the grievance.  The meeting shall be held within ten (10) calendar days of the Union's request for said meeting.  If the Vice President, or his designee, denies the grievance in writing or fails to respond within ten (10) calendar days after the meeting on the grievance, the Union may proceed to arbitration within twenty (20) calendar days of the response, or the date the response was due, whichever is earlier.

## ARTICLE X
## ARBITRATION PROCEDURE

1.   If the grievance is not settled satisfactorily in Step 3 of Article IX (Grievance Procedure), or if the Employer does not respond within the time limit established in Step 3 of Article IX, then within twenty (20) calendar days from the receipt of the Employer's answer in Step 3, or from the date said answer was due, the Union will have the right to arbitrate the grievance, provided arbitration thereof is not precluded by this Agreement. The Union's request for arbitration must be made in writing to the American Arbitration Association ("AAA") by the twentieth (20th) day, or the grievance will be deemed to have been resolved and will not be arbitrable.  The Union's right to arbitrate shall be limited to the issues set forth in the Union's written statement of the grievance as initially presented to the Employer.  It is further understood and agreed that a decision of the Union not to exercise its right to request arbitration shall be final and binding upon the members of the bargaining unit, and further that the Union, through its designated representatives, has the

18

authority to settle any grievance at any step.

2.  The Union shall submit a demand for arbitration in writing by registered letter to the American Arbitration Association and send a copy of such letter to the Employer. The Union shall specify the issues to be arbitrated and, in disciplinary matters, the clauses of the collective bargaining agreement upon which it bases its claim. The Arbitrator shall be selected according to the voluntary rules of the AAA.

3.  The Arbitrator may consider and decide only the particular grievance presented to him/her, in a written stipulation submitted by the Employer and the Union, and his/her decision shall be based solely upon an interpretation of the provisions of this Agreement. If the Employer and the Union cannot agree to a joint stipulation of the grievance issue, each party shall have the right to submit a written proposal of the issue to the arbitrator. In deciding the issue, the Arbitrator shall not consider the effect his/her award would have upon employee morale, or whether employee tensions will be heightened or diminished.  The award of the Arbitrator so appointed shall be final and binding upon the parties. The arbitrator shall have no authority to alter, amend, add to, subtract from or otherwise modify or change the terms and conditions of this Agreement. In matters involving Employer discretion, the Arbitrator may not substitute his/her judgment for that of the Employer. Only one grievance shall be submitted to the arbitrator at a time, unless the parties mutually agree otherwise.

4.  The fees and expenses of the cost of arbitrator shall be borne equally by the parties. Each party shall pay any fees of its own representatives and witnesses for time lost, and the cost of the transcript where there is no mutual agreement to order it.

5.  Any claim or suit for damages alleging a violation of Article XI (No Strike - No Lockout

19

Clause) of this Agreement shall not be subject to arbitration.

6.    Occurrences prior to the execution date or subsequent to the expiration date of this Agreement shall not be subject to arbitration.

7.    The Employer may not submit a grievance to arbitration.

8.    Since it is important that grievances and arbitrations be processed expeditiously, the number of days indicated at each level shall not be considered as merely procedural but shall be deemed of the essence and any grievance shall be waived if not appealed to the next step or to arbitration within the time limits set forth herein unless specifically agreed to by the parties in writing to extend the time limits set forth.

## ARTICLE XI
## NO-STRIKE/NO-LOCKOUT CLAUSE

1.    During the term of this Agreement or any written extension hereof, the Union, on behalf of its officers, agents and members, agrees that it will not cause, sanction or take part in any strike (whether it be economic, unfair labor practice, sympathy, or otherwise), slowdown, walkout, sit-down, picketing, stoppage of work, retarding of work or boycott, at any of the Employer's facilities or at any facility in which the Employer provides services, whether it be of a primary or secondary nature, or any other activities which interfere, directly or indirectly, with the Employer's operations and/or the operation of any facilities for which the Employer provides services for any reason. The Employer agrees that there shall be no lockout in any form during the life of this agreement.

2.    The term "strike" shall include a failure to report for work because of a primary or secondary picket line at the Employer's premises, or at the premises of a customer, whether established by this or any other union.

3.  The Company shall have the unqualified right to discharge or discipline any or all employees who engage in any conduct in violation of this Article.

4.  Any claim, action or suit damages resulting from the Union or Employer's violation of this Article shall not be subject to the grievance and arbitration provisions of this Agreement.

5.  Any alleged violation of this Article shall be deemed to be an arbitrable dispute, except as provided for in Paragraph (4) above, and shall entitle the Employer or Union to seek an injunction, pending the decision of the arbitrator.

6.  In addition to the above, should any strike (whether it be economic, unfair labor practice, sympathy or otherwise), slowdown, walkout, sit-down, picketing, stoppage of work, retarding of work or boycott, whether it be of a primary or secondary nature, and/or any other activity which interferes, directly, or indirectly, with the employer's operation and/or the operation of any facilities for which the employer provides services, the Union, within twenty-four (24) hours of a request by the employer shall:

A.  Publicly disavow such action by the employees.

B.  Notify the employees in writing that such action has not been approved by the Union, and request that they cease.

## ARTICLE XII
## HOLIDAYS

1.  Non-introductory regular employees employed on or after the effective date of this Agreement, shall receive the following major and non-major holidays:

| "Major Holidays" (Double time and one-half holidays): | "Non-major Holidays" (Double time holidays): |
|---|---|
| New Year's Day (January 1) Independence Day (July 4) Thanksgiving Day Christmas Day (December 25) | Martin Luther King Day President's Day Memorial Day Labor Day |

2.   If an employee is scheduled to work their permanent cases on a major holiday, and the employee works on the major holiday, that employee shall receive double time and one half, up to a maximum of twelve (12) hours. If an employee is scheduled to work their permanent cases on a non-major holiday, and the employee works on the non-major holiday, that employee shall receive double time, up to a maximum of twelve (12) hours.

3.   If an employee is scheduled to work their permanent cases on a major or non-major holiday, and does not work on the holiday, that employee shall receive straight holiday pay, up to a maximum of twelve (12) hours.

4.   If a replacement home attendant works on a major holiday, the replacement shall receive time and one half, up to a maximum of twelve (12) hours. If a replacement home attendant works on a non-major holiday, the replacement shall be paid for the day.

5.   To be qualified for holiday pay, employees must work their regularly scheduled workday immediately preceding and their regularly scheduled workday following such holiday.

6.   Holiday pay shall not be granted to employees who are on any of the contractual leaves of absence provided herein, layoff, or otherwise not actively employed by the Employer at the time the holiday falls.

7.   An employee who is scheduled to work on any of the contractual holidays set forth herein and does not work on that day, shall forfeit holiday pay unless such absence is cause by a

bona fide illness as substantiated by a doctor's certificate, if requested, or is otherwise excused by the Employer. Holiday pay shall be forfeited if such proof is requested and not furnished.

8. Holidays falling on a Saturday shall be celebrated on the preceding Friday. Holidays falling on a Sunday shall be celebrated on the following Monday. If an employee is scheduled to work both the actual holiday and the celebrated day, the employee may decide which day he/she will celebrate the holiday.

> e.g. Mary is scheduled to work Tuesday through Saturday for Jane Smith. Christmas falls on the Saturday and is celebrated on Friday. Mary has the option of celebrating the holiday on either the Friday or the Saturday. If she works both Friday and Saturday, she will be paid double time and one half for one day and straight time for the other. If she takes off on Friday and works Saturday, she will be paid for the holiday on Friday and will be paid her regular rate on Saturday. If she takes off on Saturday and works Friday, she will be paid her regular rate for Friday and will be paid for the holiday on Saturday.

If an employee is scheduled to work for two different clients in one week and the actual holiday falls on one client while the celebrated holiday falls on another client, the employee will receive pay for both days as holidays.

> e.g. Mary is scheduled to work Monday through Friday for Jane Smith and is scheduled to work Saturday for John Doe. Christmas falls on a Saturday but is being celebrated on the Friday. Mary chooses to take off on the Saturday. Mary will receive Double time and one half for working with Jane on Friday (because it is Christmas Day). Mary will receive straight holiday pay for Saturday (because she took off on the day the holiday was celebrated.) If Mary chooses to work Friday and Saturday, she will receive double time and one half for both days.

9. All contractual holidays set forth above shall be celebrated in accordance with the schedule followed by the HRA.

23

## ARTICLE XIII
## VACATIONS

1.  Vacation time accrues from the initial date of employment; however, you must complete your probationary period before you can take a vacation. You must request a vacation at least four (4) weeks in advance, in writing. Vacation can be denied by the Coordinator if you do not give sufficient amount of notice. Vacation can also be denied by Human Resources if the requested time falls during a scheduled physical or in-service training. You must allow at least two weeks for vacation time to be processed.

2.  Vacation is accrued at the rate of one hour of vacation per 26 hours worked up to a maximum of 2.3 hours per week.

3.  A maximum of 10 vacation days, or 120 hours, may be accrued by each Home Health Aide or Personal Care Aide. Unused accrued vacation time will be paid after July 1 of each year.

4.  Home Health Aides and Personal Care Aides will be paid for unused accrued vacation upon termination of employment unless such employee is terminated from employment for just cause. When resigning, an employee must first submit a letter of resignation in order to receive accrued vacation pay.

## ARTICLE XIV
## SICK LEAVE

1.  Sick leave accrues from the initial date of employment. Sick leave is accrued at the rate of (1) hour of sick leave per 26 hours worked up to a maximum of 2.3 hours per week.

2.  Sick time will be paid after a Home Health Aide or Personal Care Aide has been employed by MetroCare for six months and completes the probationary period. Your coordinator must approve all payments for sick time.

3. A maximum of ten sick days (120 hours) may be accrued in a fiscal year. There is a maximum lifetime limit of 120 hours of accrued sick leave. Any Home Health Aide or Personal Care Aide out for more than three (3) of the employee's consecutive working days must submit a doctor's note to return to work.

4. Home Health Aides and Personal Care Aides will not be paid for accrued sick leave upon termination of employment (voluntary or involuntary).

## ARTICLE XV
## WAGES

1.A. Minimum Hourly Rate

Effective February 25, 2003 (subject to terms of the New York City Living Wage Law).

$8.10 per hour

B. Weekend Differential

50¢ per hour

C. Overtime

50¢ per hour

D. Overnight Rates

$16.73 per day

E. Mutual Case Differential

50¢ per hour

F. In-Service Training

$6.50 per hour

2. In the event the Employer is able to provide retroactive wage increases as a result of funding received from Medicaid, such increases shall be paid only to employees actively employed with the Employer at the time of the Employer's announcement of the retroactive wage

increase.

3. The Employer will provide wage increases for employees in accordance with the terms and conditions of the New York City Living Wage Law provided that the Employer receives funding for these wage increases. In the event the Employer does not receive the necessary funding to cover the wage increases mandated by the New York City Living Wage Law, the Employer will not pay those increases and the Employer agrees to discuss with the Union alternative wage increases, if possible, based on the funding actually being received by the Employer.

4. Following the execution of this Agreement and subject to receipt of adequate funding as described in Paragraph 3 of this Article, any retroactive payments made to employees pursuant to the New York City Living Wage Law (for the period between February 25, 2003 and the execution date of this Agreement) shall be based on an employee's average weekly rate of pay which shall incorporate any pay differentials earned by that employee for the period the retroactive payment is being made for.

## ARTICLE XVI
## PAYROLL

1. The Company shall pay its employees on a consecutive bi-weekly basis.

2. The Company shall have the right to change, alter, or modify its payroll operations after written notice has been given to the Union.

## ARTICLE XVII
## NO ENTRY COMPENSATION

1. Employees who are denied entry to a client's home shall be entitled to two (2) hours pay at their regular rate of pay provided that:

A. the employee reports the denial of entry to the Employer within one (1) hour of its

occurrence.

B.      the employee receives the Employer's permission to leave the client's home.

2.      Employees must be paid for actual time if required by the Employer to remain at a specific

location for more than one (1) hour.

## ARTICLE XVIII
## MILITARY LEAVE

Employees enlisting or entering military service, or training in any subdivision of the Armed Forces of the United States, shall be granted all rights and privileges provided by the Selective Service Act of 1948, as amended, and any regulations thereunder.

## ARTICLE XIX
## JURY DUTY

The Company realizes that jury duty is an important citizen right and responsibility. Therefore, employees who serve jury duty will be compensated to the extent required by law, except that they shall receive the full amount of their regular pay for the first three (3) days of jury service, which shall be limited to one occurrence every three years.

## ARTICLE XX
## BEREAVEMENT

1.      Employees shall be excused from work for up to three (3) days to attend the funeral of immediate family members. Immediate family shall be defined as the employee's spouse, son, daughter, mother, and father.

2.      It is required that the employee notify the Coordinator as soon as possible before he/she is scheduled to begin work and to notify the Coordinator the length of time the employee will be absent.

3.      Time off for a death of immediate family will be paid out of vacation or sick time

27

accrued. If no vacation or sick time remains, the employee will not be paid for bereavement days.

## ARTICLE XXI
## SCOPE OF BARGAINING

1.  The Employer and the Union acknowledge that during the negotiations which resulted in this Agreement, each party had the unlimited right and opportunity to make demands and proposals with respect to any subject or matter not removed by law from the area of collective bargaining, and the understandings and agreements arrived at by the parties after the exercise of the right and opportunity are set forth in this Agreement.

2.  Therefore, the Employer and the Union for the term of this Agreement each voluntarily and unqualifiedly waive the right, and each agrees that the other shall not be obligated to bargain collectively with respect to any subject or matter not specifically referred to or covered in this Agreement, including fringe benefits, even though such subject or matter may not have been within the knowledge or contemplation of the parties at the time they negotiated or signed this Agreement.

3.  No agreement, alteration, understanding variation, waiver or modification of any terms or conditions or covenants contained herein shall be made by any employee or group of employees with the Employer, and in no case shall it be binding upon the parties hereto unless such agreement is made and executed in writing by both the Employer and the Union.

28

## ARTICLE XXII
## SEPARABILITY

1. In the event that any provision of this Agreement shall, at any time, be declared invalid or void by any court of competent jurisdiction or by any legislative enactment by Federal or State Statute enacted subsequent to the effective date of this Agreement, such decision, legislative enactment or statute shall not invalidate the entire Agreement, it being the express intention of the parties hereto that all other provisions not declared invalid or void shall remain in full force and effect.

2. In the event that any decision, legislative enactment or statute shall have the effect of invalidating or voiding any provision of the Agreement, the parties hereto shall meet solely for the purpose of negotiating with respect to the matter covered by the provision which may have been so declared invalid or void.

## ARTICLE XXIII
## HOME CARE RIGHTS

In case of emergency, the Company shall use its best efforts to find a replacement for a homecare worker's work assignment.

## ARTICLE XXIV
## NO DISCRIMINATION

The Employer shall not discriminate against or in favor of any employee on account of race, color, religion, citizenship, creed, national origin, gender, age, marital status, disability, or sexual orientation.

## ARTICLE XXV
## CARFARE

In the event an employee is assigned to more then one-client household the same working day, the employee shall be reimbursed for token purchases used to travel from one

client to the other as determined by the Employer. In the event the Employer expressly directs the employee to take a taxicab to the client, the cab fare shall be reimbursed.

## ARTICLE XXVI
## HEALTH BENEFITS

The Employer shall continue to provide health benefits for employees under the current health plan, but shall discuss any changes in benefits and changes in benefit plans with the Union.

## ARTICLE XXVII
## PENSION BENEFITS

The Employer will establish a 401(k) pension plan and, commencing on July 1, 2003, will contribute .12¢ per hour per eligible employee to the plan during the term of this Agreement (as defined in Article XXIX - Duration), provided Employer receives sufficient funding to pay for the contribution. Guardian Insurance shall be responsible for the administration of the benefits set forth in this Article. In the event the Employer funding changes so as to affect the pension plan, the Employer agrees to notify the Union of any changes to the pension plan caused by a change in its funding. Contributions are to begin after an employee successfully completes his/her introductory period.

## ARTICLE XXVIII
## DURATION

1.   This Agreement, signed this 4 day of Sept, 2003, became effective as of January 1, 2003, and shall remain in effect through December 31, 2004.

2    When changes in the agreement are proposed and subsequently agreed upon, they shall be reduced to writing and signed by both parties as soon as possible.

3    If either party seeks to modify or terminate the agreement, and the parties fail to reach an

agreement on the proposed changes by the annual expiration date, the Agreement shall terminate unless extended in writing by mutual consent of the parties hereto.

IN WITNESS WHEREOF, each party has caused this Agreement to be executed on the day above written by its proper officers or duly designated representatives.

**DISTRICT COUNCIL 1707**                    **METROCARE**

_____                    _____
Raglan George Jr.                          Thomas Savino
Executive Director

_____
Odessa Powell
President, Local 389, D.C. 1707

_____
Ninfa Vassallo
Asst. To Executive Director &
Director of Health Care

_____
Ethel Anderson
Bargaining Committee

31

# EXHIBIT

# B

AMERICAN ARBITRATION ASSOCIATION
VOLUNTARY LABOR ARBITRATION TRIBUNAL
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
In the Matter of the Arbitration                          :

      -between-                                          :

METROCARE HOME SERVICES                          :          <u>Case No. 13-300-00467-07</u>
          ("Employer")
                                     :

      -and-                                              :          **ARBITRATOR'S**
                                     :          **AWARD AND OPINION**

LOCAL 389, DISTRICT COUNCIL 1707,
A.F.S.C.M.E.                                              :
          ("Union")
                                   :

Re: Discharge of Kwaku Anane                          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

Before: Jay Nadelbach, Esq., Arbitrator


**<u>Appearances</u>**
For the Employer:
      Eugene F. Levy, Esq., Attorney
      Hassina Ray, Director of Field Operations
      Pamela James, Coordinating Supervisor

For the Union:
      Kennedy Jennik & Murray, P.C., Attorneys
        By: Omar Joseph, Esq.
      Rafael A. Sencion, Staff Representative
      Indira Mohan, Staff Organizer
      Kwaku Anane, Grievant


Under the parties' collective bargaining agreement, the Union took to arbitration a

grievance filed over the discharge of Mr. Kwaku Anane (hereinafter the "Grievant"), a Home

Care Attendant. A hearing in this matter was held on July 30, 2007 at the offices of the

American Arbitration Association in New York City. At that time, the parties were given a

-2-.

full and fair opportunity to present testimony, evidence, and arguments in support of their respective positions.

## ISSUE

The parties stipulated to the issue in dispute, as follows: Did the Employer have just cause to discharge the Grievant, Kwaku Anane? If not, what shall be the remedy?

## BACKGROUND

The Grievant was employed as a Home Care Attendant and provided services to home-bound clients of the Employer. He was hired in September 2002 and worked initially until March 2006. He was let go at that time after failing to submit an annual medical form. When he thereafter turned in the required form, he was re-hired in June 2006. Ultimately, he was discharged again in December 2006. That is the termination at issue in this case. The notice of discharge, dated December 5, 2006 sets forth the reason for termination as "intoxication while on duty" (see joint exhibit #1). The notice also states that "there has been too many complaints regarding Mr. Anane intoxication on the job . . . Dates of any previous warnings: 11/17/06, 4/13/05."

According to the Employer, there had been various complaints made by home-bound clients against the Grievant. As a result, the Grievant had been counseled several times. The final straw was the incident in December 2006 when a client accused the Grievant of being intoxicated. The Employer investigated and also reviewed the Grievant's work history. The decision was then made to terminate his employment.

In bringing the case to arbitration, however, the Union argued that the Employer could not meet its burden of proof. The instances of charged misconduct were all unsubstantiated, and the investigation of the last allegation (which also resulted ultimately in an unsubstantiated finding) was neither timely nor thorough. The Employer simply wanted to

-3-

get rid of the Grievant, the Union suggested, and used the last complaint as the excuse for his termination. Nonetheless, there was no proof of misconduct, and therefore, no just cause.

## SUMMARY OF TESTIMONY

### The Employer's Case

Hassina Ray, Director of Field Operations, testified to the Grievant's work history and the complaints that had been made against him. For example, the Grievant was issued a written warning notice on April 13, 2005 after he failed to arrive on time at a client's home. He was a no-show and no-call, ultimately arriving at the client's residence more than four (4) hours late.

The next problem took place on March 16, 2006. The Grievant was written up after a client complained to the social worker that he observed the Grievant masturbating. In fact, the client claimed to have a videotape of the incident. Ray testified that the client was interviewed via telephone and that a nurse was sent to examine the client. While the Grievant denied the allegations, the matter was quite serious.[1]

The Grievant was next counseled following an incident on October 2, 2006. On that day, a client apparently fell while the Grievant was transferring him from a chair to the bed. At the time, the Grievant called 911. The client was assessed, but not hospitalized. Later, the client reported that he had smelled liquor on the Grievant's breath. Both a social worker and a nurse interviewed the client. The client stated that, at the time he was being transferred

---

[1]

On cross-examination, Ray offered several substantial concessions. Significantly, the Employer's own investigation concluded that the complaint could not be substantiated. The incident itself was alleged to have occurred seven (7) months before it was reported and the client offered no reason for the lengthy delay in filing a complaint. Equally important, no one bothered to view the videotape. The client refused to provide the tape to the Employer, suggesting instead that someone come to his home to watch the tape. Ray testified that she declined the invitation and no one else from the Employer wanted to go.

-4-

to the bed, the Grievant was "staggering," and then fell with him on the bed. Although the Grievant denied drinking while on duty, (he "doesn't drink anymore," the Grievant stated to Ray, and he had not had a drink in over a year), this too was deemed to be a rather serious allegation.[2]

The final incident occurred on December 4, 2006 when a client called and left word with the Employer's answering service. The client reported that the Grievant smelled from alcohol and had fallen in the client's apartment. The Employer's on-call coordinator, Victoria Rosario, then spoke with the client and proceeded to remove the Grievant from that location.

According to Ray, this last incident made it evident that there was a problem with the Grievant's continued employment. He was discharged the following day, with the termination letter noting that there had been "too many" complaints about the Grievant's "intoxication on the job."

Ray further testified that the investigation continued after the Grievant's discharge. In March 2007, client R.T. sent a handwritten letter confirming that the Grievant was "staggering" in the apartment.[3]

---

[2]

Again, on cross-examination, Ray conceded that this complaint was also deemed "unsubstantiated." There was no actual proof that the Grievant had been drinking. Nevertheless, the Employer believed that the complaint itself signaled a problem with the Grievant.

[3]

The letter (see Employer exhibit #4) actually sets forth "3 incidents" or complaints. The client complained about the Grievant "borrowing money" (the client wrote "I have a promissory note" which "I showed to the Social Worker"), that the Grievant "was outside panhandling," and that on the night in question when the client called Grievant at 8:30 p.m. to assist him, the Grievant came out of his room and "seemingly staggered. I asked him was he o.k., he said yes. I smelled what seemed like alcohol upon his breath. When I questioned if he had been drinking, he started stuttering as usual. I had suspected his drinking on the job, but I wasn't sure.

Another incident, I asked [the Grievant] to place a mouse trap on a counter. Once again [he] seemed intoxicated and this time he fell off the counter . . . ."

-5-

The bottom line was that the Employer could not take a chance on continuing to employ the Grievant. Based upon his complete file, including the prior incidents, he posed an unreasonable risk to both himself and to clients.[4]

**The Union's Case**

The Union contended that all of the incidents highlighted and relied upon by the Employer were insufficient to support his termination from employment. There was simply no proof of intoxication. The Employer nevertheless acted upon the allegations.

In his testimony, the Grievant responded to each one of the charges. With regard to the March 2006 masturbation allegation, the Grievant thoroughly denied the charge. He noted that there were, at that time, three (3) home attendants who serviced the client. Assuming the incident did, in fact, take place, it readily could have been one of the other attendants.

Regarding the October 2006 incident, the Grievant denied that he was intoxicated. In fact, he denied that either he or the client had fallen down. After bringing the client in a wheelchair from the kitchen to the bedroom, the Grievant placed the wheelchair in front of the bed and proceed to lift the client onto the bed. Unfortunately, his foot got caught in some of the electric wires on the floor and he tripped a bit.[5] This movement caused him to push

---

[4]

Ray acknowledged that none of the incidents, including the final one in December 2006, had been substantiated. The Employer did not have clear proof that the Grievant had been intoxicated. But the clients' reports of the Grievant's appearance she said, was sufficient to raise serious doubts about his ability to continue to care for clients.

On re-direct testimony, Ray recalled an additional incident that took place on November 17, 2006. The Grievant failed to report the need to leave the client's home while on duty. Instead, he simply left to pick up medication for himself. While he was gone, the client called the Employer to report that the Grievant was gone. The Grievant was again counseled, therefore, on that occasion.

[5]

The Grievant acknowledged that he did not report this unsafe condition to the Employer.

-6-

the client on the bed and the Grievant momentarily toppled on top of the client.

With regard to the November 2006 incident, the Grievant admitted he made a mistake. He knew that it was not appropriate to leave a client unattended for an extended period of time without notifying the Employer. That day he had run out of his own blood pressure medication. When he finished all of the client's household duties (mopping, cleaning, cooking) and after he put the client in bed, he told the client that he was going to the pharmacy. The client merely said "Ok". When he returned three (3) hours later,[6] the client was fine. The client told him that the Employer had called, and that the Grievant was to report to the office the next day.

While his actions that day may have been inappropriate, the Grievant also testified that he complained to his coordinator, Victoria Rosario, that this client was particularly rude, calling him a "dog" and a "monkey." The Grievant asked to be transferred to a different client. The Employer, however, did not accommodate him.

The last incident in December 2006 also involved the same client. On that shift, after the client was put to bed at night, the Grievant went to his assigned room. He took his medication and also went to bed.[7] Several hours later, the client called him. Because he was medicated and was supposed to be laying down, he felt somewhat dizzy when he got up to respond to the client. The client accused him of drinking, but he told the client he had just taken medication.

---

[6]

The Grievant explained, that after waiting patiently for a bus, he ended up walking to the pharmacy. He waited there for the prescription to be filled and then he walked back.

[7]

The Grievant testified that, at the time, he was taking aspirin, folic acid, Lexapro, and Diphenhydramine. The medication made him a little weak and drowsy, and made his eyes burn. He eventually went back to his doctor to get the dosages changed.

The Grievant insisted, however, that there was no cause for concern for the client. The medications treated the Grievant's blood pressure and, after he lay still for awhile at night, he was always fine.

-7-

The next day when he was confronted and terminated, the Grievant was not permitted to write up his version of events. He testified that coordinator Rosario, without even interviewing him, simply told him he was fired. When he questioned her, Rosario told him that the coordinating supervisor, Pamela James, had decided to terminate him.

## DISCUSSION

I have carefully reviewed and considered the entire record produced at the arbitration hearing. For the reasons set forth below, I find that the Employer did not have just cause to discharge the Grievant, Kwaku Anane.

As the parties surely recognize, two of the important elements of the just cause standard are the need for a timely, thorough and complete investigation of the facts, and a reasoned determination of whether sufficient evidence exists to prove that an employee is guilty as charged. These critical components must be satisfied for the employer to meet its burden of proof. Stated differently, the burden in any disciplinary case requires the employer to demonstrate that it considered any and all available facts, and that convincing proof of wrongdoing has been established. Certainly, proof is the key. If no misconduct can be proven, no penalty can be accepted as just.

In the instant case, investigation and proof were elements that undercut the Employer's case. A review of the underlying incidents reveals that the Employer failed to completely investigate, to carefully consider all of the available evidence, and to produce sufficient proof of the Grievant's culpability. It seems that the Employer was too quick and ready to accept the clients' allegations without formal proof of the Grievant's misconduct. Notably, the Grievant consistently denied all of the allegations and the Employer's own internal investigations concluded that the complaints were "unsubstantiated." Despite these conclusions, however, the Employer decided to build a case against the Grievant based solely on the various complaints. It seems as if the Employer believed that it was up to the Grievant

-8-

to prove himself "not guilty."

Specifically, regarding the March 2006 masturbation episode, there can be no doubt that the Employer failed to consider several important matters. First, the misconduct allegedly occurred many months earlier; yet no effort was made to determine why the client delayed his report for this lengthy period of time and whether the delay impacted his judgment. The Grievant also contended that two other male home attendants cared for the client at or about the time of the alleged incident; yet, the Employer made no effort to investigate the Grievant's assertion. Did the incident truly happen? And if so, was the client's identification of the Grievant a case of mistaken identity? Most crucial, the Employer failed to follow up on the one lead that could have answered these questions. The client claimed he had a videotape of the incident. He did not want to give the Employer the tape, but he apparently was willing to play the tape for the Employer in his home. Yet, the Employer made no effort to view the tape. Its inactions were astonishing. No one, Ray testified, wanted to go to the client's home.

The last two incidents involved claims that the Grievant had been drinking or was intoxicated. Yet, no proof was found (again, the claims were determined to be "unsubstantiated") and none was offered at the arbitration hearing. The Employer made no effort to examine the clients' credibility.[8] And the Employer took no steps to learn whether the Grievant was really intoxicated.

Nonetheless, this was the heart-and-soul of the Employer's case. It is, therefore, apparent that the Employer wanted to oust the Grievant simply because there had been a

---

[8]

Clearly, the condition of the clients, and their ability to comprehend and relate the truth should have been analyzed. In the last episode, for example, the client related two other serious allegations (see footnote 3) against the Grievant -- that he had borrowed money from the client and that he panhandled -- that, if true, were also egregious actions. But if not true, these false claims would have cast serious doubts upon the client's credibility. Yet, the Employer evidently failed to review or investigate these matters.

-9-

number of complaints which posed, according to the Employer, an unreasonable risk to clients, to the Grievant himself, and to the Employer.

The Employer's conclusions, however, were faulty and its judgment was flawed. Nothing in the record supports the Employer's assessment of the various incidents nor its concern that the continued employment of the Grievant posed an extraordinary danger. There is quite plainly no basis upon which the discharge can be maintained.

### AWARD

The grievance is upheld.  The Employer did not have just cause to discharge the Grievant, Kwaku Anane.

The Grievant shall be immediately reinstated to his position with full back pay and benefits, from the date of discharge to the date of reinstatement, minus interim earnings, if any.

This Award is final and binding.  I shall retain jurisdiction, however, for the limited purpose of resolving any disputes that may arise regarding the implementation of the remedy set forth herein.

Dated:    August 16, 2007
          New York, New York

_Jay Nadelbach_
JAY NADELBACH

-10-

## AFFIRMATION

STATE OF NEW YORK           )

                                   :ss.:

COUNTY OF NEW YORK        )

     I, JAY NADELBACH, affirm upon my oath as Arbitrator, that I am the person described in and who executed this instrument which is my Award.

JAY NADELBACH